MOLLY M. LENS (S.B. #283867)
mlens@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067-6035
Telephone:  +1 310 553 6700
Facsimile:   +1 310 246 6779

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Floor
New York, New York 10019
Telephone:  +1 212 326 2000
Facsimile:   +1 212 326 2061

JOSHUA REVESZ (*pro hac vice*)
jrevesz@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone:  +1 202 383 5300
Facsimile:   +1 202 383 5414

*Attorneys for Defendants CBS Studios Inc. and Paramount Global*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN BENEKER,<br><br>Plaintiff,<br><br>v.<br><br>CBS STUDIOS, INC. and PARAMOUNT GLOBAL,<br><br>Defendants. | Case No.: 2:24-cv-01659-JFW-SSC<br><br>**CBS STUDIOS INC. AND PARAMOUNT GLOBAL'S NOTICE OF MOTION AND MOTION TO DISMISS THIRD AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:    August 19, 2024<br>Time:   1:30pm<br>Judge:  Hon. John F. Walter<br>Courtroom:  7A<br><br>Third Amended Complaint Filed: June 10, 2024<br><br>[Declaration of Molly M. Lens filed concurrently herewith] |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on August 19, 2024, at 1:30pm, or as soon thereafter as the matter may be heard in Courtroom 7A of the above-entitled court, located at 350 West 1st Street, Los Angeles, California 90012, Defendants CBS Studios Inc. and Paramount Global (collectively "CBS"), by and through their counsel, will and hereby do move this Court for entry of an order dismissing the Third Amended Complaint of Plaintiff Brian Beneker, pursuant to Federal Rule of Civil Procedure 12(b)(6).

CBS makes this motion on the grounds that CBS has a constitutional right under the First Amendment to select the writers whose work shapes CBS's artistic enterprise. CBS also asserts that aspects of Beneker's Third Amended Complaint are time-barred.

This motion is made following a conference of counsel pursuant to (1) Local Rule 7-3, and (2) this Court's June 4, 2024, order. The conference of counsel took place on June 13, 2024, when the parties discussed the substance and potential resolution of the filed motion by videoconference. *See* Dkt. 46.

This motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the accompanying Declaration of Molly M. Lens and exhibits contained therein, the pleadings and papers on file in this action, and such other evidence and argument as may be properly received by the Court. As further discussed in the joint statement filed following that conference of counsel, the parties' discussions to date have eliminated several issues in this suit, and the parties are in agreement that the only remaining issues are fundamental legal questions that warrant resolution from this Court.

1

Dated: June 24, 2024                              **O'MELVENY & MYERS LLP**

2

3

4

By: _____

5

Molly M. Lens
mlens@omm.com

6

7

*Attorneys for Defendants CBS Studios*
*Inc. and Paramount Global*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

RELEVANT ALLEGATIONS ............................................................................ 2

LEGAL STANDARD .......................................................................................... 4

ARGUMENT ........................................................................................................ 4

    I.    CBS'S FIRST AMENDMENT RIGHT TO CREATE THE
        ARTISTIC CONTENT IT CHOOSES IS A COMPLETE
        DEFENSE TO BENEKER'S CLAIMS ................................................ 5

        A.    An Entity Engaged In Expression Has A First
                 Amendment Right To Select Who Will Convey Its
                 Message ....................................................................................... 5

        B.    The First Amendment Protects CBS's Decision To
                 Employ Writers Of Its Choosing ................................................ 9

                1.    CBS's Television Shows Are Protected Speech ............. 9

                2.    CBS's Choice of Writers Directly Affects Its
                     Ability To Tell The Stories It Aims To Tell ................. 10

        C.    Both Of Beneker's Claims Should Be Dismissed .................... 14

    II.    BENEKER'S SECTION 1981 CLAIM IS UNTIMELY AS TO
        TWO OF THE THREE CHALLENGED HIRING DECISIONS ...... 16

CONCLUSION ................................................................................................... 19

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ................................................................. 10, 15

*Anderson v. City of Hermosa Beach*,
  621 F.3d 1051 (9th Cir. 2010) ................................................ 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................ 4

*Baghikian v. Providence Health & Servs.*,
  __ F. Supp. 3d __, 2024 WL 487769 (C.D. Cal. Feb. 6, 2024) .......... 15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................ 4

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ........................................................*passim*

*Brush & Nib Studio, LC v. City of Phoenix*,
  448 P.3d 890 (Ariz. 2019) ..................................................... 13, 14

*Cherosky v. Henderson*,
  330 F.3d 1243 (9th Cir. 2003) ................................................ 18

*Claybrooks v. American Broadcasting Cos.*,
  898 F. Supp. 2d 986 (M.D. Tenn. 2012) ................................ 7, 8, 15

*Currier v. Culture Kings USA, Inc.*,
  2024 WL 2107713 (C.D. Cal. Mar. 29, 2024) ......................... 11

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
  450 U.S. 107 (1981) ................................................................ 6

*Durnford v. MusclePharm Corp.*,
  907 F.3d 595 (9th Cir. 2018) ................................................. 15

*Goodman v. Lukens Steel Co.*,
  482 U.S. 656 (1987) ............................................................... 17

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Green v. Miss United States of America, LLC*,
  52 F.4th 773 (9th Cir. 2022) ............................................................*passim*

*Guessous v. Fairview Prop. Invs., LLC*,
  828 F.3d 208 (4th Cir. 2016) ...................................................................18

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) .................................................................*passim*

*Johnson v. Lucent Tech. Inc.*,
  653 F.3d 1000 (9th Cir. 2011) ...............................................................17

*Jones v. Bock*,
  549 U.S. 199 (2007) ...................................................................................4

*Jones v. R.R. Donnelly & Sons Co.*,
  541 U.S. 369 (2004) ..................................................................................17

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ...............................................................11

*Lukovsky v. City & Cnty. of San Francisco*,
  535 F.3d 1044 (9th Cir. 2008) ...............................................................17

*Lyle v. Warner Brothers Television Productions*,
  38 Cal. 4th 264 (2006) .................................................................8, 10, 11

*McDermott v. Ampersand Publishing, LLC*,
  593 F.3d 950 (9th Cir. 2010) .......................................................7, 10, 12

*McLaughlin v. Homelight, Inc.*,
  2021 WL 5986913 (C.D. Cal. Sept. 17, 2021) ......................................11

*Moore v. Hadestown Broadway LLC*,
  __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024) ..................8, 15

*National Railroad Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ..................................................................................18

*Peña v. Clark Cnty.*,
  2023 WL 3160157 (W.D. Wash. Apr. 28, 2023) ..................................19

-iii-

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Pino v. Cardone Cap. LLC*,
  2023 WL 7800138 (C.D. Cal. Oct. 4, 2023) ......................................................11

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ............................................................................................10

*RK Ventures, Inc. v. City of Seattle*,
  307 F.3d 1045 (9th Cir. 2002)............................................................................18

*Sams v. Yahoo! Inc.*,
  713 F.3d 1175 (9th Cir. 2013)...............................................................................4

*Schad v. Borough of Mount Ephraim*,
  452 U.S. 61 (1981) .................................................................................................9

*Tamkin v. CBS Broad., Inc.*,
  193 Cal. App. 4th 133 (2011) ................................................................................9

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ...............................................................................11

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ...............................................................................................5

*Wilson v. Cable News Network, Inc.*,
  7 Cal. 5th 871 (2019)...........................................................................................12

**Statutes**

42 U.S.C. § 1981...................................................................................................3, 17

Cal. Code Civ. Proc. § 335.1 ...................................................................................17

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................4

**Other Authorities**

Mark Seal, *The* Godfather *Wars*, Vanity Fair (Mar. 2009),
  https://www.vanityfair.com/news/2009/03/godfather200903............................13

1
2

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

3
4
5

August Wilson, *'I Want A Black Director'*, N.Y. Times (Sept. 26, 1990), https://www.nytimes.com/1990/09/26/opinion/i-want-a-black-director.html ............................................................13

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

The First Amendment to the United States Constitution generally forbids the government from dictating to artistic creators how to develop and express their own artistic messages.  Just as a newspaper is entitled to broad deference in choosing which writers to employ to express its editorial positions, a creative production enterprise is entitled to broad deference in choosing which writers to employ to pen the stories it desires to tell.

Defendants CBS Studios Inc. and its parent company Paramount Global (collectively "CBS") create television programming, including the successful CBS show *SEAL Team*.  At its core, the Third Amended Complaint ("TAC") alleges that CBS has determined to showcase diverse storytelling and has focused on hiring of Black, Indigenous, and other people of color ("BIPOC") writers to help tell those stories.  The plaintiff in this action, Brian Beneker, is a heterosexual white man who complains that he was not hired as a staff writer for *SEAL Team*, and who theorizes that his non-hiring stems from his race, sex, and/or sexual orientation.

The First Amendment bars Beneker's claims in full.  The First Amendment embodies a core principle of speaker's autonomy that bars the government from dictating to expressive enterprises like CBS what to say and how to say it.  It therefore displaces applications of statutes, including anti-discrimination laws, that would force an expressive enterprise to compromise its own message.  The allegations in Beneker's TAC amply demonstrate that holding CBS liable for declining to hire him would prevent CBS from hiring the storytellers whom CBS believes are best suited to tell the stories CBS wants to produce and broadcast.  Granting relief to Beneker would impair CBS's ability to speak on its own terms, and so would contravene the First Amendment.  The TAC should be dismissed on this basis alone.

MOTION TO DISMISS
2:24-CV-01659-JFW-SSC

1    Because First Amendment protection is dispositive, the Court need not

2    proceed further.  But, even leaving the First Amendment aside, the Section 1981

3    claim in Beneker's TAC is untimely as to the two of the three hiring decisions that

4    Beneker asserts violate that statute.  Accordingly, at a minimum, the Court should

5    hold that Beneker cannot press his Section 1981 claim as to those writers.

6                        **RELEVANT ALLEGATIONS**[1]

7    Beneker is a "white, heterosexual male" who alleges that he became a script

8    coordinator for *SEAL Team* in March 2017.  Dkt. 45 (TAC) ¶¶ 3, 23.  He alleges

9    that he was employed as a script coordinator throughout *SEAL Team*'s seven

10   seasons, with one brief gap during the show's second season.  *See id.* ¶¶ 33-34.  He

11   also alleges that he occasionally wrote scripts for the show as a freelance writer.  *Id.*

12   ¶¶ 24, 42, 49, 64.

13   Beneker asserts that, beginning in *SEAL Team*'s third season, in

14   approximately June of 2019, he sought employment as a staff writer on the show.

15   TAC ¶ 36.  He alleges that, after expressing interest in that role, the show hired six

16   staff writers instead of him, specifically:

17      • A "black male" hired in season 3 (in approximately June 2019), *id.* ¶ 38[2];

18      • A "black woman" also hired in season 3 (in approximately September

19         2019), *id.* ¶ 40;

20      • A "white" "female former writer's assistant" hired in season 5 (in

21         approximately May 2021), *id.* ¶ 48;

22      • A "black" "female writer's assistant[]" hired in season 6 (in

23         approximately May 2022), *id.* ¶¶ 51-52;

24

25   _____

     [1] For purposes of this Motion only, CBS accepts the TAC's factual allegations as

26   true.

27   [2] This allegation appears to contradict Beneker's later claim that "all of" the staff

28   writers hired "are female."  TAC ¶ 63.

- A "white," "lesbian" "female writer's assistant[]" also hired in season 6, *id.* ¶¶ 51, 53; and

- A "white" "female writer's assistant" hired in Season 7 (in May of 2023), *id.* ¶ 61.

In Beneker's telling, all of these hires were in service of CBS's "diversity efforts." TAC ¶ 13. Beneker notes that the CEO of CBS Entertainment Group set a "goal" that 40 percent of writers on the network's primetime series be BIPOC. *Id.* ¶ 15. And his complaint is full of news articles, website pages, and press releases explaining CBS's desire to cultivate diverse writers' rooms. *Id.* ¶¶ 13-21.

In February 2024, Beneker filed his initial complaint; the complaint has subsequently been amended on three occasions. *See* Dkts. 1, 29, 37, 45. In his first count, he alleges that CBS violated Section 1981, which prohibits racial discrimination in contracting. TAC ¶¶ 70-77; *see* 42 U.S.C. § 1981. That count is premised on the alleged decisions to hire the three Black writers instead of Beneker; Beneker acknowledges that he cannot state a Section 1981 claim as to the alleged three decisions to hire white writers. TAC ¶ 70. In his second count, he alleges that CBS violated Title VII of the Civil Rights Act of 1965, which prohibits (as relevant here) race, gender, and sexual orientation discrimination in employment. *Id.* ¶¶ 78-85. Beneker alleges that he complied with Title VII's administrative-exhaustion requirements, with his charge with the Equal Employment Opportunity Commission ("EEOC") filed on December 20, 2023. *Id.* ¶¶ 69, 84. He premises his Title VII claim only on the alleged decision to hire the writer hired in Season 7 instead of him, because he admits that the other hiring decisions in the TAC are not timely under Title VII. *See id.* ¶ 83. Beneker seeks declaratory relief, an injunction requiring CBS "to offer Plaintiff a full-time job as a producer"—even though he

does not allege he ever sought or was denied a producing role—and compensatory and punitive damages.  *Id.* at 10-11.[3]

## LEGAL STANDARD

To prevail on a motion to dismiss, the moving party must show that the allegations contained in the complaint, taken as true, are insufficient as a matter of law to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the pleading party must proffer enough facts to state a claim for relief that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That standard requires more than "labels and conclusions": a "formulaic recitation of the elements of a cause of action will not do."  Id.  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation omitted), and "a bare assertion" of an element "will not suffice," *id.* at 556.  The "assertion of an affirmative defense may be considered properly on a motion to dismiss where the allegations in the complaint suffice to establish the defense."  *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (internal quotation marks omitted) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

## ARGUMENT

Beneker alleges that CBS violated antidiscrimination law when it chose to prioritize diversity of its writers to shape the expressive content of the show *SEAL Team*.  Assuming Beneker's allegations are true, his suit cannot proceed because the First Amendment protects precisely that artistic choice.  And even setting that dispositive defense aside, Beneker's TAC should be narrowed to exclude as time-barred two of the three hiring decisions that he alleges violate Section 1981.

---

[3] Beneker initially sued CBS Entertainment Group, LLC but later dismissed that defendant, which is not affiliated with the other defendant entities.  Dkt. 30.

## I.   CBS'S FIRST AMENDMENT RIGHT TO CREATE THE ARTISTIC CONTENT IT CHOOSES IS A COMPLETE DEFENSE TO BENEKER'S CLAIMS

Under the First Amendment, an entity engaged in expressive communication may select individuals whose presence or absence would affect the entity's ability to communicate its own preferred message.  Beneker's TAC alleges—repeatedly—that CBS passed him over for a writing role because it chose to prioritize diversity in its writers' rooms.  Assuming those allegations are true, that decision is protected by the First Amendment because, as Beneker's TAC recognizes, who writes for a creative production like *SEAL Team* affects the stories that *SEAL Team* tells.  So limiting CBS's ability to select the writers of its choice—as Beneker seeks to do here—unconstitutionally impairs CBS's ability to shape its message.

### A.   An Entity Engaged In Expression Has A First Amendment Right To Select Who Will Convey Its Message

The First Amendment reflects a "principle of autonomy to control one's own speech."  *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995).  Thus, the government cannot compel private individuals and entities to express messages they do not want to express.  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Nor may it control a speaker's "expression of value, opinion, or endorsement."  *Hurley*, 515 U.S. at 573.

The fundamental First Amendment rule of "speaker's autonomy" applies with equal force when an entity speaks in association with others.  *Id.* at 578.  In *Hurley*, the Supreme Court unanimously held that the organizer of a parade had a constitutional right to exclude from the parade a group seeking to "impart[] a message the organizers do not wish to convey" on issues surrounding gay rights.  *Id.* at 559.  The Court explained that "the parade's overall message is distilled from the individual presentations along the way."  *Id.* at 577.  Accordingly, allowing the

gay rights group to sue for inclusion in the parade would impermissibly "compel the speaker to alter the message" it wished to convey.  *Id.* at 581.

Five years later, the Supreme Court reaffirmed this principle to hold that entities engaged in expression have a First Amendment right to select only individuals who channel that expression—even where those membership choices would otherwise violate anti-discrimination law.  In *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Court considered the Boy Scouts' decision to revoke the membership of an openly gay assistant scoutmaster because the organization— which had a mission to instill values in young people—at that time believed that homosexuality was inconsistent with Scouting values.  *Id.* at 644.  The Court held that this choice was protected by the First Amendment, and thus that the Boy Scouts had a complete defense to a New Jersey antidiscrimination law that barred discrimination on the basis of sexual orientation in places of public accommodation.  *See id.* at 645.  That result followed, the Court explained, because the Boy Scouts "engage[d] in expressive activity" in educating young men, and because "the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate" its views.  *Id.* at 650.  The Court held that it must "defer" to the Boy Scouts' account of "what would impair its expression," because courts should not second-guess an entity's expression "on the ground that they view a particular expression as unwise or irrational."  *Id.* at 651, 653 (quoting *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 124 (1981)).

Together, *Dale* and *Hurley* establish that the government cannot force an entity engaged in expressive activity to express its message through speakers who, in the employer's view, would affect the employer's ability to convey its own preferred message.  Decisions since those cases have applied the same principle to

reject claims seeking to hold private expressive organizations liable for making personnel choices that best advance their expressive messages.

For example, in *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950 (9th Cir. 2010), the Ninth Circuit held that a newspaper could not be forced to hire editors who expressed viewpoints on union-related topics with which the newspaper disagreed. *Id.* at 953. The court explained that "[t]elling the newspaper that it must hire specified persons . . . as editors and reporters . . . is bound to affect what gets published." *Id.* at 962. And, citing *Hurley*, it then explained that, "[t]o the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice." *Id.*

The Ninth Circuit likewise held more recently that the First Amendment protects a beauty pageant's right not to include transgender participants, because the inclusion of such participants was "an expressive decision" that was the pageant's own choice to make. *Green v. Miss United States of America, LLC*, 52 F.4th 773, 786 (9th Cir. 2022). "[F]or expressive productions such as pageants," the court explained, "there is no daylight between speech and speaker." *Id.* at 781. Thus, the "forced inclusion" of even "a single participant" would "significantly affect the speaker's message" and so was constitutionally forbidden. *Id.* at 785-86.

Finally, in the specific context of theatrical and television productions, two district courts have held that production companies have a First Amendment right to cast actors of certain races based on the producer's view of the effect of casting on the artistic works' expressive content. In *Claybrooks v. American Broadcasting Cos.*, 898 F. Supp. 2d 986 (M.D. Tenn. 2012), the plaintiffs asserted that ABC violated civil rights law in declining to cast a Black lead on *The Bachelor* and *The Bachelorette*. *Id.* at 989. Applying *Hurley*, the district court granted ABC's motion to dismiss. It explained that "casting decisions are a necessary component of any entertainment show's creative content," and that "regulating the casting process

necessarily regulates the end product." *Id.* at 999.  And recently, in *Moore v. Hadestown Broadway LLC*, __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024), the Southern District of New York held—again, at the motion-to-dismiss stage—that the First Amendment barred a race-discrimination claim brought by a Black actor who was allegedly fired because the production thought that an all-Black chorus would convey a "white savior story" and alter the play's message.  *Id.* at *20.

Finally, the Supreme Court of California has considered these constitutional questions in adjudicating an employment discrimination suit brought by a television writer.  In *Lyle v. Warner Brothers Television Productions*, 38 Cal. 4th 264 (2006), the court unanimously rejected a comedy writer's sexual-harassment claim relating to crude jokes in the *Friends* writers' room on statutory grounds.  *Id.* at 272. Concurring, Justice Chin explained that the First Amendment would also bar the suit, because "[t]he writers of the television show, *Friends*, were engaged in a *creative* process—writing adult comedy"—and so their conduct warranted constitutional protection.  *Id.* at 295 (Chin, J., concurring).  As Justice Chin further explained, "[l]awsuits . . . directed at restricting the creative process in a workplace *whose very business is speech related* [] present a clear and present danger to fundamental free speech rights."  *Id.* at 297.

The speaker's autonomy principle applied in *Dale*, *Hurley*, and other precedents is a "fundamental rule of protection under the First Amendment," *Hurley*, 515 U.S. at 573, but it does not afford boundless constitutional immunity to all private employers seeking to select employees.  Far from it: the First Amendment protection at issue here, while fundamental, is circumscribed in scope. Only an entity engaged in "expression" can invoke the First Amendment to defend its employment decisions.  *Dale*, 530 U.S. at 641.  And even as to expressive entities, the right to control one's own speech under the First Amendment applies

only to decisions that affect one's own speech, such as avoiding associations that could "impart[] a message" the speaker "do[es] not wish to convey." *Hurley*, 515 U.S. at 559. Under this principle, a decision made for reasons unrelated to the enterprise's expressive conduct would not implicate the principle of speaker's autonomy. So, even with expressive entities, a hiring decision involving an employee who does not speak or write on behalf of an employer to convey the employer's expressive or creative viewpoints would not implicate the First Amendment at all.

> **B.     The First Amendment Protects CBS's Decision To Employ Writers Of Its Choosing**

Under *Hurley*, *Dale*, and the other cases discussed above, this is an easy case. The First Amendment rule of speaker's autonomy gives CBS, and CBS alone, the right to decide what stories to tell in its television programming. And CBS has the corresponding right to select which writers are best suited to tell those stories. The First Amendment therefore defeats Beneker's theory that CBS cannot decide which stories to tell and who should tell them.

> 1.     CBS's Television Shows Are Protected Speech

It is beyond dispute that the First Amendment protects CBS's production of *SEAL Team*. "[P]rograms broadcast by radio and television" are expressive works that "fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) ("The creation of a television show is an exercise of free speech."). *SEAL Team*, like any other television show, thus qualifies as protected speech, and by natural extension, the scripts that form the basis for each episode are also protected speech. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) ("[W]e have never seriously questioned that the processes of

writing words down on paper . . . are purely expressive activities entitled to full First Amendment protection.").[4]

### 2.   CBS's Choice of Writers Directly Affects Its Ability To Tell The Stories It Aims To Tell

Because CBS's works are expressive, CBS has the right to select employees whose work affects that expression.  Under the First Amendment principle of speaker's autonomy, CBS is entitled to "deference" both in developing its artistic message and in determining who conveys that message, including the decision it makes in assembling the writers' room.  *Dale*, 530 U.S. at 653.  As the Supreme Court put it, courts must "give deference to an association's assertions regarding the nature of its expression" and "must also give deference to an association's view of what would impair its expression."  *Id*.  The question thus is not whether the court may "disagree" with the expressive entity's "values or find them internally inconsistent."  *Id.* at 651.  Rather, when an entity "selects the expressive units" of its work "from potential participants" in that work, the entity's determination "is enough to invoke its right as a private speaker to shape its expression."  *Hurley*, 515 U.S. at 574.

The category of employees covered by this doctrine includes writers like Beneker.  As the Ninth Circuit has recognized, the "choice of writers affects the expressive content" of a work.  *McDermott*, 593 F.3d at 962.  That is true for a television show as well as for a newspaper.  *See Lyle*, 38 Cal. 4th at 295 (Chin, J., concurring).  The TAC confirms that the *SEAL Team* writers determine what would

---

[4] Because speakers do not "shed their First Amendment protections by employing the corporate form to disseminate their speech," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023), CBS's right to develop and express its artistic message in its own preferred manner is not limited by the company's for-profit status, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.").

appear on the show, with Beneker alleging that scripts he wrote as a *SEAL Team* freelancer turned into episodes of the show.  *See* TAC ¶¶ 27, 43, 49.

After all, to write successfully, "writers must tap into places in their experience or psyches."  *Lyle*, 38 Cal. 4th at 298 (quoting amicus brief from the Writers Guild of America, Directors Guild of America, and Screen Actors Guild). They "get their ideas wherever they can," including from their own lives.  *Id.* at 299 (quoting same).  The people who write for CBS's television shows, therefore, shape the stories that those shows tell.  Again, Beneker's TAC confirms that a writer's experience affects the show's storytelling, as he acknowledges that "military experience" is an "'extra' qualification[]" to write for *SEAL Team*.  TAC ¶ 66.

Further still, the materials on which Beneker's allegations expressly rely confirm that the identity of CBS's writers matters to CBS's creative expression.[5] One Paramount press release that Beneker invokes explains that Paramount desired to tell "stories focused on or related to underrepresented groups and issues," and that "representation in writers' rooms" was important to that goal.  *See* Declaration of Molly M. Lens ("Lens Decl.") ¶ 3 & Ex. A, at 5.  Another news report that Beneker relies upon quotes CBS Entertainment Group's president and chief executive noting that diversity initiatives in writers' rooms "will help accelerate efforts to broaden our storytelling and make CBS programming even more diverse

---

[5] These materials may be considered at the motion-to-dismiss stage because they are incorporated by reference into the complaint.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("rationale of the 'incorporation by reference' doctrine applies with equal force to internet pages as it does to printed material") (alterations adopted and internal quotation marks omitted); *Currier v. Culture Kings USA, Inc.*, 2024 WL 2107713, at *3 n.2 (C.D. Cal. Mar. 29, 2024); *McLaughlin v. Homelight, Inc*., 2021 WL 5986913, at *1 (C.D. Cal. Sept. 17, 2021); *see also Pino v. Cardone Cap. LLC*, 2023 WL 7800138, at *5 (C.D. Cal. Oct. 4, 2023) (Walter, J.) (considering letter referred to and quoted in the complaint).  When a document is incorporated by reference, the Court "may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

and inclusive." Lens Decl. ¶ 4 & Ex. B, at 8. A final Paramount webpage that Beneker alleges substantiates his discrimination claim further supports the connection. "As a pioneer in content that represents and appeals to diverse audiences," Paramount explained, "we are also resolute that diversity, equity and inclusion must be reflected within our content and behind the scenes." Lens Decl. ¶ 5 & Ex. C, at 13. Hence, CBS embraces the belief "that to be the best creators and storytellers," it "must reflect, celebrate and elevate the diversity of [its] audiences." *Id.*

CBS thus is entitled to shape its creative works like *SEAL Team* by employing the writers whom it thinks will best craft those works. So just as the *Dale* plaintiff's membership would "significantly burden the Boy Scouts' desire" to speak on the topics it wanted, 530 U.S. at 653, forcing CBS to employ Beneker as a staff writer—instead of the writers CBS wishes to employ—would significantly burden CBS's ability to shape the stories that it aims to tell. The same principle of speaker's autonomy controlled in *Hurley*, where the parade organizer's choice of marchers affected the "common theme" of the parade, 515 U.S. at 576; in *McDermott*, where the choice of writers affected "the ability of the newspaper owner and publisher to exercise control over the news pages," 593 F.3d at 962[6]; and

---

[6] In *Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871 (2019), the California Supreme Court ruled that CNN could not raise an anti-SLAPP defense to a claim premised on its decision to fire an employee who held a "part-time role as a writer" for its website. *Id.* at 897. The court so held based on its finding that "CNN [failed] to demonstrate that Wilson, in his capacity as a writer, had authority to determine what would appear on CNN's website," and that it was "CNN['s] . . . burden of showing Wilson's role bore such a relationship to its exercise of editorial control as to warrant protection under the anti-SLAPP statute." *Id.* at 896. Given that *Wilson* is an anti-SLAPP decision based on a particular factual record, the decision is inapposite here. But, even if this Court were to find some tension between the Ninth Circuit's ruling in *McDermott* and the California Supreme Court's approach in *Wilson*, this Court, of course, should follow *McDermott*. This

in *Green*, where the choice of pageant participants affected the message conveyed by the competition, 52 F.4th at 786.[7]

It is not relevant to this analysis that Beneker disagrees with CBS's alleged stance on diversity in writers' rooms. The rule of speaker's autonomy applied in *Dale* and *Hurley* means that CBS, not Beneker (or the government), has the sole right to decide what artistic content to produce and how to produce it. The rule also means that CBS, not Beneker (or the government), is solely entitled to decide what messages it seeks to convey in its artistic content and what associations might advance or impair those efforts. *See supra* at 5-8.

Nor does it matter that Beneker is just one aspiring writer among many would-be participants in a writers' room. As the Ninth Circuit explained, "it is simply incorrect to assert that the inclusion of only a single participant would not affect the speaker's message." *Green*, 52 F.4th at 786. "Speech must be viewed as a whole, and even one word or brush stroke can change its entire meaning." *Id.* (quoting *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 909 (Ariz.

---

is especially true given that Beneker's own TAC confirms the relationship between the writers and *SEAL Team*'s content. *See* TAC ¶¶ 27, 43, 49.

[7] A focus on the identity of creators is nothing new for creators. For example, when making *The Godfather*, Paramount thought that retaining "real Italian-Americans to produce, direct, and star" would be key to the film's artistic success, and so hired Francis Ford Coppola despite his relative inexperience as a director. Mark Seal, The Godfather *Wars*, Vanity Fair (Mar. 2009), https://www.vanityfair.com/news/2009/03/godfather200903. A non-Italian-American could have tried to sue Paramount under Title VII for making that choice, but under the First Amendment, the suit could not have succeeded: Paramount was entitled to consider national origin in selecting *The Godfather*'s director, precisely because it thought that Coppola's identity mattered to *The Godfather*'s story. *See also, e.g.*, August Wilson, *'I Want A Black Director'*, N.Y. Times (Sept. 26, 1990), https://www.nytimes.com/1990/09/26/opinion/i-want-a-black-director.html (August Wilson explaining importance of Black director for *Fences*). So too here. The TAC and supporting materials allege that CBS believes that its shows, including *SEAL Team*, will be more compelling if their storytellers are more diverse. The Constitution protects that time-honored artistic choice.

2019)).  That is why, in *Hurley*, "the Supreme Court determined that one banner in a parade of 20,000 participants changed the expressive content of the entire parade."  *Id.* (quoting *Brush & Nib Studio*, 448 P.3d at 909).  Precisely the same principle applies here: Any governmental intrusion on CBS's artistic and employment decisions would "significantly affect" the *SEAL Team* writers' room and alter the stories that the show tells.  *Id.* at 786.

### C.    Both Of Beneker's Claims Should Be Dismissed

CBS's First Amendment right to choose the writers who tell its stories precludes both of Beneker's causes of action, and so both causes of action should be dismissed under Rule 12(b)(6).

Where the Constitution and a statute conflict, the statute must yield to the Constitution.  The Supreme Court's decisions in *Hurley* and *Dale* and the Ninth Circuit's decision in *Green* all hold that antidiscrimination laws, like those at issue here, cannot constitutionally be applied to "require speakers to modify the content of their expression."  *Hurley*, 515 U.S. at 578; *see Dale*, 530 U.S. at 658-59; *Green*, 52 F.4th at 792.  That is because the interests advanced by those laws, although undoubtedly weighty, cannot justify any "intrusion on the . . . rights to freedom of expressive association."  *Dale*, 530 U.S. at 659; *see 303 Creative*, 600 U.S. at 592 ("[N]o public accommodations law is immune from the demands of the Constitution."); *Green*, 52 F.4th at 792 (noting "courts' long-standing hesitation to enforce anti-discrimination statutes in the speech context"); *see also Moore*, 2024 WL 989843, at *19 ("Such unconstitutional regulation of the message Defendant wants its Musical to convey warrants dismissal of Plaintiff's four counts of discrimination.").  So those laws—even though applicable in non-speech contexts—cannot trammel on the First Amendment principle of speaker's autonomy by compelling CBS to speak through certain writers.

And in light of the allegations and materials in Beneker's TAC, no discovery or fact-finding is needed to resolve CBS's First Amendment defense.  To the contrary, the Ninth Circuit has underscored "the importance of resolving First Amendment cases at the earliest possible junction," because "the First Amendment's protections extend to not only unconstitutional laws, but also to unnecessary *litigation* that chills speech." *Green*, 52 F.4th at 800.  Where, as here, the complaint contains and incorporates material that "admits all the ingredients of an impenetrable defense," the earliest possible junction is on a  motion to dismiss. *Baghikian v. Providence Health & Servs.*, __ F. Supp. 3d __, 2024 WL 487769, at \*2 (C.D. Cal. Feb. 6, 2024) (Walter, J.) (quoting *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8 (9th Cir. 2018)).  Thus, in both *Claybrooks* and *Moore*, the district courts resolved the First Amendment issue on the pleadings.  *Claybrooks*, 898 F. Supp. 2d at 989; *Moore*, 2024 WL 989843, at \*19.  And, in *Green*, the district court resolved the case after the defendant beauty pageant filed a motion to dismiss, allowing limited discovery (and so converting the motion to summary judgment) on only a question of whether the pageant was an "expressive association" that could invoke the protections of *Hurley* and *Dale*.  52 F.4th at 779. The analogous question is not subject to dispute here, because CBS plainly creates artistic content.  *See supra* at 9-10.  Thus, there are no facts that would prevent the Court from ruling on this dispositive issue.

For all these reasons, holding CBS liable under either of the anti-discrimination statutes Beneker invokes would directly conflict with the First Amendment's free-speech guarantee.[8]  Beneker's TAC alleges that CBS chose to

---

[8] It would equally violate CBS's right of expressive association.  "Speech and association claims often run together." *Green*, 52 F.4th at 808 (VanDyke, J., concurring).  Both doctrines ask the same basic question: May the government determine which individuals CBS speaks through, or associates with?  "Given this reality, it should not be a surprise . . . that [CBS's] association claim, like its free speech claim, is meritorious." *Id.*

prioritize diversity in writers' rooms. *See supra* at 3. That choice, taken as true, is entitled to First Amendment protection because holding CBS liable for taking the actions alleged in Beneker's suit would "require [CBS] to modify the content of [its] expression." *Hurley*, 515 U.S. at 578; *see supra* at 5-6. Neither Title VII nor Section 1981 can constitutionally apply in these circumstances, and so the First Amendment is a complete bar to Beneker's claims.

## II. BENEKER'S SECTION 1981 CLAIM IS UNTIMELY AS TO TWO OF THE THREE CHALLENGED HIRING DECISIONS

If the Court dismisses the case as barred by the First Amendment, it need not proceed to any other issue. Otherwise, however, it should hold that Beneker's Section 1981 claim is untimely as to two of the hiring decisions that Beneker alleges are the product of race discrimination.

As discussed above, Beneker alleges that he was passed over to be a *SEAL Team* writer six times, and that six other writers were hired in his stead. *See supra* at 2-3. Two of the writers—a "black male" and a "black woman"—were allegedly hired during season 3 of the show, in "approximately June of 2019." TAC ¶¶ 36, 38, 40. Beneker alleges that the hiring of those writers, as well as the hiring of a "black" "female writer's assistant" in May 2022, violates Section 1981.

Section 1981, which protects citizens from racial discrimination in contracts, sets out a limitations period of no more than four years from the date of the complaint. *See* 42 U.S.C. § 1981. The text of the law itself does not specify a statute of limitations. *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 371 (2004). Accordingly, the Supreme Court has instructed that courts should generally apply "the most appropriate or analogous state statute of limitations," drawn from the State's personal-injury statute, to a Section 1981 claim. *Id.* (quoting *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987)). In California, that statute of limitations is two years. *Johnson v. Lucent Tech. Inc.*, 653 F.3d 1000, 1008 (9th

Cir. 2011); *see* Cal. Code Civ. Proc. § 335.1.  But when a Section 1981 claim is premised on 1991 amendments to that provision, the Supreme Court has explained that a four-year statute of limitations applies, because 28 U.S.C. § 1658 imposes a general four-year limitations period for all statutes enacted after December 1, 1990. *Jones*, 541 U.S. at 382.

The Court need not decide whether Beneker's Section 1981 claim is governed by a two-year or four-year limitations period because the allegations concerning the two writers hired in 2019 are untimely regardless.  Those hirings transpired more than four years before the February 29, 2024 filing of this complaint.  TAC ¶¶ 38, 40.  Accordingly, the alleged actions related to those writers fall outside of *any* Section 1981 statute of limitations, and the Section 1981 claim should be narrowed to exclude allegations concerning the writers hired in 2019.

Nor does the "continuing violations" doctrine salvage the untimely filing of his Section 1981 claims, as Plaintiff contended during the parties' meet-and-confer discussions.  That is because, under Section 1981, "refusal to hire" is a "discrete act that triggers running of statute of limitations."  *Lukovsky*, 535 F.3d at 1049, 1051. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held in a Title VII case that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Id.* at 113.  The Court thus rejected the "continuing violations doctrine," which lower courts had developed, and which held that if "one act falls within the charge filing period, discriminatory and retaliatory acts that are plausibly or sufficiently related to that act may also be considered for the purposes of liability." *Id.* at 114.

After *Morgan*, the Ninth Circuit has recognized that the continuing violations doctrine is equally inapplicable to discrimination claims brought under other

antidiscrimination statutes.  *In Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003), the court observed that, "[a]lthough *Morgan* involved Title VII . . . the Supreme Court's analysis . . . applies with equal force to the Rehabilitation Act and to actions arising under other civil rights laws."  *Id.* at 1246 n.3.  And in *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002), the court applied *Morgan* to a suit brought under 42 U.S.C. § 1983, a statute closely related to Section 1981.  *Id.* at 1058-60.  Every court of appeals that has had occasion to consider the issue has held that the same rule applies for purposes of Section 1981, *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223-24 (4th Cir. 2016) (collecting cases), as have district courts within this Circuit, *see Peña v. Clark Cnty.,* 2023 WL 3160157, at *6 (W.D. Wash. Apr. 28, 2023) ("District courts in the Ninth Circuit apply *Morgan* to both Title VII and § 1981 cases.") (collecting cases).

This Court should join that consensus, hold that Beneker's Section 1981 complaint related to the two writers hired in 2019 is untimely, and dismiss the Section 1981 claim to the extent that it relies on those allegations.

1

**CONCLUSION**

2    Because CBS has a constitutional right to select the writers who work in the

3  *SEAL Team* writers' room, the TAC should be dismissed in full with prejudice.  In

4  the alternative, the Court should dismiss Beneker's Section 1981 claim with

5  prejudice as untimely to the extent it is premised on the two writers allegedly hired

6  in 2019.

7

8

9  Dated: June 24, 2024                    **O'MELVENY & MYERS LLP**

10

11

12                                        By:

13                                            Molly M. Lens

14                                        Molly M. Lens
                                          mlens@omm.com
15                                        1999 Avenue of the Stars, 8th Floor
                                          Los Angeles, California  90067-6035
16                                        Telephone:  +1 310 553 6700
                                          Facsimile:   +1 310 246 6779
17

18

19

20                                        *Attorneys for Defendants CBS Studios*
                                          *Inc. and Paramount Global*
21

22

23

24

25

26

27

28

-19-

1

**CERTIFICATE OF COMPLIANCE**

2        The undersigned, counsel of record for Defendants CBS Studios Inc. and

3   Paramount Global, certifies that this brief contains 5,829 words, which complies

4   with the word limit of Local Rule 11-6.1, and does not exceed 25 pages, which

5   complies with the page limit set out in Section 5(c) of the Court's standing order.

6

7   Dated: June 24, 2024             **O'MELVENY & MYERS LLP**

8

9

10                        By: _____

11                             Molly M. Lens

12                       Molly M. Lens

13                       mlens@omm.com

14

15                       *Attorney for Defendants CBS Studios Inc. and Paramount Global*

16

17

18

19

20

21

22

23

24

25

26

27

28