MOLLY M. LENS (S.B. #283867)
mlens@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Floor
New York, New York 10019
Telephone: +1 212 326 2000
Facsimile: +1 212 326 2061

JOSHUA REVESZ (*pro hac vice*)
jrevesz@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorneys for Defendants CBS Studios Inc. and Paramount Global*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN BENEKER,<br><br>Plaintiff,<br><br>v.<br><br>CBS STUDIOS, INC. and PARAMOUNT GLOBAL,<br><br>Defendants. | Case No.: 2:24-cv-01659-JFW-SSC<br><br>**CBS STUDIOS INC. AND PARAMOUNT GLOBAL'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>Date: August 19, 2024<br>Time: 1:30pm<br>Judge: Hon. John F. Walter<br>Courtroom: 7A<br><br>Third Amended Complaint Filed: June 10, 2024 |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

    I.    CBS HAS A COMPLETE FIRST AMENDMENT DEFENSE TO THIS SUIT ............................................................................................ 2

        A.    Beneker Concedes That An Expressive Entity Has A Constitutional Right To Shape Its Expressive Content .............. 3

        B.    As Alleged Here, CBS Prioritized Diversity In Its Writing Rooms To Ensure Diversity In Its Content ............................... 5

        C.    Beneker's Litany Of Hypotheticals Is Far Afield ...................... 8

    II.   MOST OF BENEKER'S SECTION 1981 ALLEGATIONS ARE UNTIMELY ................................................................................ 9

CONCLUSION .......................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Alliance for Equal Rights v. Fearless Fund Management, LLC*,
103 F.4th 765 (11th Cir. 2024) ................................................................................ 9

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) ............................................................................... 3, 5, 7

*Carano v. Walt Disney Co.*,
2024 U.S. Dist. LEXIS __, No. 2:24-cv-1009 (C.D. Cal. July 24, 2024) ........................................................................................................... 8

*Green v. Miss United States of America, LLC*,
52 F.4th 773 (9th Cir. 2022) ................................................................................ 3

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ............................................................................................. 3

*Lelaind v. City & Cnty. of San Francisco*,
576 F. Supp. 2d 1079 (N.D. Cal. 2008) .............................................................. 11

*Lukovsky v. City and County of San Francisco*,
535 F.3d 1044 (9th Cir. 2008) ............................................................................ 10

*Lyle v. Warner Bros. Television Prods.*,
38 Cal. 4th 264 (2006) ......................................................................................... 6

*Manatt v. Bank of America, NA*,
339 F. 3d 792 (9th Cir. 2003) ............................................................................. 11

*McDermott v. Ampersand Publishing, LLC*,
593 F.3d 950 (9th Cir. 2010) ............................................................................ 4, 6

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ..................................................................................... 3, 4

*Moore v. Hadestown Broadway LLC*,
__ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024) ........................... 4

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ....................................................................................... 9, 11

## INTRODUCTION

Beneker's opposition to CBS's motion to dismiss concedes the critical legal points that govern this case. Beneker admits—as he must under governing law—that an entity engaged in expressive conduct has a First Amendment right to shape that conduct through its hiring decisions. He acknowledges—as he must under governing law—that an expressive entity may make choices on the basis of race, sex, or other protected characteristics to advance the entity's expressive aims. He grants—as he must under governing law—that an entity's choice of writers for a work can affect the message of that work. And he does not question—nor can he under governing law—that an entity engaged in expression is entitled to deference about what decisions will affect that expression.

The limited dispositive disagreement between the parties, therefore, is whether CBS's choice of writers for its television show *SEAL Team* affects, in CBS's view, the expressive content of that show. Beneker's own complaint and supporting materials are crystal-clear on this point: CBS chose to prioritize diversity in its writers' rooms because it wants to tell diverse stories in its television programming. That quintessentially expressive choice about what content to broadcast is entitled to constitutional protection. Even further still, Beneker specifically pleads that when he wrote for *SEAL Team*, his writing impacted CBS's expressive content.

Rather than reckon with his own allegations, Beneker spends much of his brief battling with hypotheticals. But this case is far afield from the parade of horribles he conjures. Properly understood, the First Amendment defense that CBS invokes arises when, and only when, an expressive entity chooses who will shape that expression for reasons relating to the expression itself. The First Amendment has no bearing on the vast majority of hiring decisions. Thus, Beneker's claims—

including that ruling for CBS would effectively give any creative enterprise a "license to discriminate"—are exceedingly overheated.

Finally, Beneker has no real response to CBS's showing that his Section 1981 claim is untimely as to two of the three hiring decisions about which he complains. Beneker acknowledges that those decisions fall outside of Section 1981's statute of limitations, and does not dispute that no continuing-violations doctrine can save Section 1981 claims based on discrete discriminatory acts. Instead, he seeks to invoke the discovery rule and the fraudulent-concealment doctrine in a manner foreclosed by Ninth Circuit precedent, and then suggests, contrary to the Supreme Court's square holding on this topic, that his claims should be treated differently because he alleges a pattern of discrimination at CBS. Neither argument has merit, and Beneker's Section 1981 claim should be limited to the sole hiring decision that occurred within the statute of limitations.

## ARGUMENT

CBS moves to dismiss this case in its entirety because Beneker's suit is barred by the First Amendment. *See* Mot. 5-16. Alternatively, it moves to dismiss Beneker's Section 1981 claim to the extent it is premised on the hiring of two writers in 2019, years before the filing of this lawsuit. *See* Mot. 16-18. Beneker's responses to each of these independent bases for dismissal are unavailing.

**I.    CBS HAS A COMPLETE FIRST AMENDMENT DEFENSE TO THIS SUIT**

CBS's motion to dismiss rests on the fundamental premise that the First Amendment protects the right of an entity engaged in expression to select those employees who, in its view, will affect its expression. As alleged in the complaint and supporting materials, CBS determined that the composition of its writers' rooms would affect the expression conveyed in its television programming. Moreover, Beneker *agrees* that the *SEAL Team* writers affect that very expressive

1  content. Therefore, CBS has a First Amendment right to select the *SEAL Team*
2  writers of its choice.

3  Beneker's opposition *agrees* with the major, doctrinal premise of CBS's
4  argument. It disagrees only with a minor, case-specific premise: that CBS made its
5  decisions about the *SEAL Team* writers' room based on a desire to shape its
6  expression. But Beneker's objections ignore the allegations in his *own* complaint
7  and otherwise fail to grapple with the inherent relationship between writers' lived
8  experiences and their creative output.

      **A.    Beneker Concedes That An Expressive Entity Has A Constitutional Right To Shape Its Expressive Content**

11  Beneker's opposition reveals that the parties are in *agreement* about the law
12  that governs this case. Beneker concurs that the First Amendment protects hiring
13  decisions—even ones based on "race, sex, or sexual orientation"—that "alter[] the
14  expressive content" of an expressive entity. Opp. 9. Indeed, he makes the point
15  again and again, acknowledging that hiring and similar decisions are
16  constitutionally protected where they "alter[] the organization's expressive
17  message," "alter the group's ability to advocate its viewpoint," distract from "the
18  message the producer wanted to deliver," "interfere[] with the expressive conduct
19  itself and the message the employer, by its expressive conduct, wishes to convey,"
20  or fall into "the narrow category in which a person's sex, race or sexual orientation
21  impinges on the creative effort." *Id.* at 8, 10, 12, 20. And he recognizes that this
22  rule is drawn from "a couple of dozen cases that are inarguably good law," *id.* at 9,
23  including decisions of the Supreme Court and Ninth Circuit, *see Boy Scouts of*
24  *America v. Dale*, 530 U.S. 640 (2000); *Hurley v. Irish-American Gay, Lesbian &*
25  *Bisexual Grp. of Boston*, 515 U.S. 557 (1995); *Green v. Miss United States of*
26  *America, LLC*, 52 F.4th 773 (9th Cir. 2022). And indeed, a recent Supreme Court
27  decision, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), confirms the force of
28

this case law, with the Court citing *Hurley* to observe that "[a] private party's collection of third-party content into a single speech product . . . is itself expressive, and intrusion into that activity must be specially justified under the First Amendment." *Id.* at 2401.

Beneker's discussion of a recent Southern District of New York decision, *Moore v. Hadestown Broadway LLC*, __ F. Supp. 3d __, 2024 WL 989843 (S.D.N.Y. Mar. 7, 2024), nicely illustrates the parties' agreement on the legal test. CBS noted in its motion that the Southern District held, at the motion-to-dismiss stage, that "the First Amendment barred a race-discrimination claim brought by a Black actor who was allegedly fired because the production thought that an all-Black chorus would convey a 'white savior story' and alter the play's message." Mot. 8. Beneker not only agrees with that description, *see* Opp. 11-12, but also suggests his agreement with the decision: as he explains, the "producers' creative choice" that their show "was better served with a mixed race cast than one that was exclusively African American[] was protected under the First Amendment," *id.* at 12.

Beneker also recognizes that writers can affect the message of an expressive work. Addressing the Ninth Circuit's decision in *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950 (9th Cir. 2010), Beneker writes that the newspaper in that case had a right to make hiring decisions "on the basis of the impact the fired writers would have had on the message the publisher wanted to convey." Opp. 14. And he quotes the Ninth Circuit's recognition that a "publisher's choice of writers affects the expressive content of [a] newspaper." *Id.* at 13 (quoting *McDermott*, 593 F.3d at 962 (emphasis removed)).

Finally, Beneker does not dispute the Supreme Court's holding that courts must "give deference to an association's assertions regarding the nature of its expression" and "must also give deference to an association's view of what would

-4-

REPLY ISO
MOTION TO DISMISS
2:24-CV-01659-JFW-SSC

impair its expression." *Dale*, 530 U.S. at 653; *see* Mot. 10. Thus, he implicitly acknowledges that courts should not conduct their own *de novo* inquiry into what decisions would "alter[] the expressive content" of the entity and thus warrant constitutional protection. Opp. 9.

### B. As Alleged Here, CBS Prioritized Diversity In Its Writing Rooms To Ensure Diversity In Its Content

The parties' agreement on the key issues makes this case an easy one. CBS and Beneker dispute only one point.[1] CBS asserted in its motion that its "choice of writers directly affects its ability to tell the stories it aims to tell." Mot. 10 (capitalization altered). Beneker, meanwhile, claims that CBS's decisions about the staffing of its writers' rooms are "independent of the expressive conduct" in which CBS engages. Opp. 6. Therefore, resolving this motion requires the Court to answer a single question: At this stage of the litigation, whose stance is the correct one?

The answer is CBS's, and the proof is in the materials relied upon by Beneker in his complaint. It is not CBS's status generally as an "entertainment enterprise" that is decisive here. Rather, as explained at length in CBS's opening brief, "the materials on which Beneker's allegations expressly rely confirm that the identity of CBS's *writers* matters to CBS's creative expression." Mot. 11 (emphasis added). The complaint cites, for example, a press release noting that "representation in writers' rooms" is important to Paramount's goal of telling "stories focused on or related to underrepresented groups and issues." Declaration

---

[1] Beneker does not contest most of CBS's arguments particular to this case. He does not question that *SEAL Team* is an expressive work protected by the First Amendment. *See* Mot. 9-10. He does not disagree that CBS, as a for-profit entity, has the same First Amendment rights as any other speaker. *See id.* at 10 n.4. And, as noted below, he does not dispute that CBS's statements are incorporated by reference into his complaint—indeed, he himself cites those materials in his opposition. *See id.* at 9.

of Molly M. Lens ("Lens Decl.") ¶ 3 & Ex. A, at 5. The complaint also cites language from Paramount's website stating that "to be the best creators and storytellers," its employees "must reflect, celebrate, and elevate the diversity of [its] audiences." Lens Decl. ¶ 5 & Ex. C, at 13. And the complaint invokes a quote from CBS Entertainment Group's President and Chief Executive Officer noting that CBS's diversity efforts aimed to "accelerate efforts to broaden our storytelling and make CBS programming even more diverse and inclusive." Lens Decl. ¶ 4 & Ex. B, at 8.

In other words, the materials in Beneker's own complaint confirm that CBS has long believed that its "choice of writers affects the expressive content" of its television programming. *McDermott*, 593 F.3d at 962. That should be no surprise: who writes a story shapes what story is told. That is because, as Justice Chin explained, "writers must tap into places in their experience or psyches" in order to produce artistic expression. *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 298 (2006) (Chin, J., concurring). Beneker agrees. Indeed, Beneker alleges that the scripts he wrote as a *SEAL Team* freelancer turned into episodes of the show. *See* TAC ¶¶ 27, 43, 49. And Beneker also alleges that life experiences, such as military experience, are qualifications for writers. *See* TAC ¶ 66.[2]

So—as CBS's pre-litigation statements indicate—a writer with one set of life experiences will produce different television scripts than a writer with another. CBS has a First Amendment right to decide which of these scripts it prefers, and a corresponding First Amendment right to decide how to assemble a writers' room

---

[2] As a throwaway assertion, Beneker suggests that prioritizing diverse representation on *SEAL Team* is not worthy of constitutional protection because "the actual Navy SEAL unit is between 85% and 95% white, 2% black and 100% male." Opp. 8 (emphasis omitted). But even supposing those statistics are accurate and before the Court on this motion to dismiss (they are not), they are irrelevant to the case at hand. CBS, not Beneker or this Court, gets to decide whether to prioritize diversity in its production of *SEAL Team*. *See* Mot. 13.

1  that will produce the content it wishes to air. Thus, it is not the "status" of the
2  writers that matters, but the *experiences* that the writers bring to the creative
3  process. And if there were any doubt on this point, *Dale* resolves it: CBS is entitled
4  to "deference" as to its "view of what would impair its expression," including its
5  view concerning the composition of its writing staff. 530 U.S. at 653.

6  Beneker has little to say in response, other than to cast CBS's choices about
7  the composition of the *SEAL Team* writers' room as a "business policy;" but even
8  then, he fails to explain how the selection of writers to convey CBS's storytelling is
9  not protected expressive conduct. Opp. 5, 9. He does not dispute that CBS's
10 statements are incorporated by reference into Beneker's complaint, or that they are
11 appropriate for consideration at the motion-to-dismiss stage—indeed, he himself
12 cites those materials in his opposition. *See id.* at 9. But he also does not engage
13 with those materials, ignoring entirely the statements cited in CBS's motion to
14 dismiss. So, for example, when he writes that CBS "do[es] not indicate what
15 message [its] expressive conduct is intended to convey," he is just wrong. *Id.* at 7-
16 8. The "message" is prioritizing "stories focused on or related to underrepresented
17 groups and issues," or, put differently, "mak[ing] CBS programming even more
18 diverse and inclusive." Lens Decl. ¶¶ 3-4 & Exs. A-B, at 5, 8. And when Beneker
19 complains that CBS does not "indicate how the hiring of a white, heterosexual male
20 writer would somehow interfere with that expressive conduct," Opp. 8, he errs
21 again: diverse "representation in writers' rooms," CBS explained, is key to its
22 artistic goals. Lens Decl. ¶ 3 & Ex. A, at 5. Beneker's inability to engage with
23 these statements—which are incorporated by reference into his complaint—is fatal
24 to his suit.[3]

---

[3] On July 24, another court in this District issued an opinion denying The Walt Disney Company's motion to dismiss, based on the First Amendment, a complaint brought by an actress who previously appeared on Disney's television programming. *Carano v. Walt Disney Co.*, 2024 LEXIS __, No. 2:24-cv-1009

### C. Beneker's Litany Of Hypotheticals Is Far Afield

Much of Beneker's brief is unrelated to the case at hand. Instead of engaging with the materials incorporated into his complaint, Beneker prefers to discuss far-fetched hypotheticals. He frets, for example, that granting CBS's motion would "open the door to any enterprise that engages in advocacy, such as law firms . . . to discriminate against women, people of color and homosexuals." Opp. 15-16. He therefore describes CBS's position as "monstrous," *id.* at 16, and he even posits hyperbolically that granting the motion would harken back to "the Jim Crow South," *id.* at 5.

Beneker's heated rhetoric aside, there is no basis for his concerns. Beneker is wrong to suggest that CBS believes that "[m]erely engaging in a creative enterprise . . . give[s] a corporation license to discriminate." Opp. 15. To the contrary, as the motion to dismiss explained, the First Amendment protects a hiring decision only when that decision is: (1) made by an expressive entity; (2) about an individual whose conduct shapes the entity's expression; and (3) taken for reasons relating to the expressive entity's preferred expression. *See* Mot. 8-9. The vast majority of any company's employees do not shape the entity's expression, and so decisions about those employees have no First Amendment implications. And even as to employees who affect the entity's expression, the First Amendment applies only where, as here, the entity connects its choice of employee to its expressive goals. So, to use Beneker's prime example, a "law firm[]" (even if qualifying as an "expressive entity") has no right to "discriminate against women" unless—and no

---

(C.D. Cal. July 24, 2024) (ECF No. 45). The court's holding rested on the view that "the Complaint lacks allegations to support Defendants' assertion" that they cut ties with the actress to advance their expressive aims. *Id.* at *22. Here, by contrast, Beneker's complaint clearly alleges that CBS took its actions to support diversity goals with which Beneker disagrees. Thus, even assuming that the *Carano* decision accurately reflects the law in this area, it does not favor Beneker's position.

law firm could do this—it could show that the law firm's expression would be compromised unless it could prefer men over women.

A recent Eleventh Circuit decision that Beneker relies heavily on exemplifies the circumscribed role that the First Amendment has in hiring-type decisions. In *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, 103 F.4th 765 (11th Cir. 2024), the court considered whether a venture-capital fund had a First Amendment right to supply grants only to Black women. *Id.* at 769. It held that the fund did not, because the fund's "refus[al] to entertain applications from business owners who aren't 'black females'" was not "sufficiently 'expressive' to warrant protection under the Free Speech Clause." *Id.* at 779. That holding is consistent with CBS's arguments here because the *Fearless Fund* defendant never explained how any expression of its own would be compromised if it were forced to consider all applicants. Therefore, the First Amendment did not come into play. Instead, the constitutional defense arises only in cases—like this one—where an entity has a specific expressive interest that would be undermined. Thus, rather than undermining CBS's case, *Fearless Fund* confirms that Beneker's parade of horribles will not come to pass.

## II. MOST OF BENEKER'S SECTION 1981 ALLEGATIONS ARE UNTIMELY

If the Court proceeds past the First Amendment issue (and, to be clear, it should not), it should hold that Beneker's Section 1981 claim is untimely as to the two hiring decisions in June 2019 that he alleges were the product of racial discrimination. *See* Mot. 16-18.

Again, Beneker essentially concedes CBS's showing on the governing law. He agrees, as he must, that the continuing-violations doctrine does not apply to "discrete discriminatory acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *see* Opp. 16. And he does not contest that the alleged hiring of writers

-9-

REPLY ISO
MOTION TO DISMISS
2:24-CV-01659-JFW-SSC

1  in season 3 falls outside of Section 1981's statute of limitations.  Nonetheless, he
2  makes two related arguments to try to excuse his untimely filing.  Both
3  arguments—the first based on the discovery rule, and the second based on the idea
4  that CBS has a pattern of discriminatory hiring—run headlong into binding law.

*First*, Ninth Circuit precedent forecloses Beneker's effort to invoke the discovery rule or any doctrine of "fraudulent concealment."  *See* Opp. 17.  In *Lukovsky v. City and County of San Francisco*, 535 F.3d 1044 (9th Cir. 2008), the court confronted the question of whether the discovery rule tolls the statute of limitations when a plaintiff is unaware "that the employer acted with discriminatory intent in performing th[e] [adverse] act." *Id.* at 1048.  The answer is no: "the claim accrues upon awareness of the actual injury, i.e., the adverse employment action, and not when the plaintiff suspects a legal wrong." *Id.* at 1049.  And for similar reasons, the Ninth Circuit rejected the plaintiff's argument that a defendant's "fraudulent concealment" of the reasons underlying an adverse employment action should equitably toll the limitations period. *Id.* at 1052.  Instead, the Ninth Circuit held that a plaintiff cannot excuse an untimely filing without indicating conduct by the defendant "'*above and beyond* the wrongdoing upon which the plaintiff's claim is filed.'"  *Id*. (quotation omitted) (emphasis in original).  Beneker does not allege that he was affirmatively misled by CBS, and instead concedes that he relied on "plausibly benign explanations" as to why he was not hired.  Opp. 18.[4]  Apart from the claim that Beneker was passed over because of his race, Beneker does not allege, for example, that CBS "concealed the composition of the applicant pool, [or] the qualifications of those actually hired," or that CBS made "any promise" that discouraged him "from timely asserting [his] rights."  *Lukovsky*, 535 F.3d at 1052.  Therefore, *Lukovsky* precludes Beneker's attempt to save his untimely allegations.

---

[4] In any event, the hiring goals that Beneker complains about were not put in place until 2020, *after* the 2019 hiring decisions. TAC ¶¶ 15-20.

*Second*, the Supreme Court has expressly rejected Beneker's attempt to repackage his allegations as a "continuous and pervasive policy." Opp. 18. The Supreme Court has squarely held that the alleged adverse employment actions at issue—"failure to promote, denial of transfer, or refusal to hire"—are quintessential "discrete acts" that are "separate[ly] actionable." *Morgan*, 536 U.S. at 114; *see Lelaind v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1093 (N.D. Cal. 2008).[5] Accordingly, each of those "discrete acts" starts its own statute of limitations—even if they are allegedly part of a "policy or practice of discrimination," as Beneker claims here. *Morgan*, 536 U.S. at 107, 114. Beneker's argument—that ordinary statute-of-limitations rules do not apply where "allegations depict a continuous and pervasive policy of discrimination, rather than disconnected, isolated incidents," Opp. 18—merely seeks to revive the very doctrine that *Morgan* considered and rejected. *See* 536 U.S. at 105 (reversing Ninth Circuit precedent that "a plaintiff may sue on claims that would ordinarily be time barred so long as they . . . are part of a systematic policy or practice of discrimination that took place"). Beneker's reliance on case law discussing hostile work environment claims is inapposite, given he has not pled any hostile work environment. Opp. 17-18. While hostile work environment claims may be subject to the continuing violations theory, *Morgan*, 536 U.S. at 115, Beneker neither mentions a hostile-work-environment theory in his operative complaint nor makes any attempt to satisfy the elements of such a claim. *See Manatt v. Bank of America, NA*, 339 F. 3d 792, 798 (9th Cir. 2003) (quotation omitted) (requiring, *inter alia*, that a plaintiff show "verbal or physical conduct" that "create[d] an abusive work environment").

---

[5] Because "failure to promote" is a "discrete act[]," *Morgan*, 536 U.S. at 114, Beneker's observation that he "still works for CBS" has no relevance, Opp. 18.

# CONCLUSION

The Court should grant CBS's motion to dismiss.

Dated: July 29, 2024          **O'MELVENY & MYERS LLP**

By: _____
             Molly M. Lens

Molly M. Lens
mlens@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

*Attorneys for Defendants CBS Studios Inc. and Paramount Global*